**United States District Court**
For the Northern District of California

1

2

3

4                                       **E-FILED on    1/23/13    **

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

| | |
|---|---|
| 12   MICHAEL A. DESANTIS, an individual; and RICHAND J. DESANTIS, an individual, | No. C-07-03564 RMW |
| 13 | |
| 14                 Plaintiffs, | **ORDER DENYING BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND REMANDING** |
| 15       v. | |
| 16   SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | **[Re Docket Nos. 51, 53]** |
| 17             Defendant. | |

18

19       Plaintiffs Michael and Richard DeSantis, sons of Medicare beneficiary Robert DeSantis

20 ("decedent"), bring this action for judicial review of the final decision of the Secretary of the

21 Department of Health and Human Services ("Secretary") partially denying payment of Medicare

22 benefits. The matter is now before the court on the parties' cross-motions for summary judgment.

23 Having considered the papers submitted by the parties and the administrative record of proceedings

24 before the agency, and for the reasons discussed below, the court denies both parties' summary

25 judgment motions and remands to the Secretary for a coverage determination and order on the issue

26 of reimbursement for decedents' medical services rendered as routine care for his underlying

27 congestive heart failure during the period from August 4, 2000 through September 18, 2000.

28

ORDER DENYING BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND REMANDING—No. C-07-03564 RMW
ALG

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. BACKGROUND

### A. Factual Background

On July 24, 2000, decedent was admitted to Sacred Heart Medical Center ("SHMC") for congestive heart failure issues.  Administrative Record filed April 30, 2008, Dkt. No. 14 ("Tr."),[1] at 15.  On August 3, 2000, the necessary paperwork was completed for decedent's admission to a clinical trial known as the Pneumatic HeartMate Assist as Destination Evaluation ("PHADE"), which was being conducted at SHMC in conjunction with the Heart Institute of Spokane.  Tr. 72, 217.  The following day, August 4, 2000, decedent underwent surgery to implant a left ventricular assist device ("LVAD"), or artificial heart.  Tr. 72.  Decedent remained hospitalized until December 26, 2000.  Tr. 60, 188.

On June 7, 2000, President William Clinton signed an Executive Memorandum directing the Secretary of Health and Human Services to authorize payment for patient care due to medical complications associated with clinical trial participation.  Tr. 99.  On September 19, 2000, the Centers for Medicare and Medicaid Services ("CMS"), who administer the Medicare program, issued  a national coverage decision, Medicare Coverage Issues Manual ("CIM") 30-1, implementing Clinton's Executive Memorandum.  Tr. 82-86.  CIM 30-1 provides that Medicare will cover the routine costs of qualifying clinical trials, effective for items and services furnished on or after September 19, 2000.  *Id.*  Under the regulation, clinical trials meeting certain criteria are "automatically qualified to receive Medicare coverage."  Tr. 84.

CIM 30-1 excluded from coverage, however, items and services "not covered by virtue of a national noncoverage policy in the [CIM]."  Tr. 83 ("[I]f  the item or service is not covered by virtue of a national noncoverage policy in the [CIM] and is the focus of a qualifying clinical trial, the routine costs of the clinical trial . . . will be covered by Medicare but the noncovered item or service,

---

[1]  The Secretary filed two transcripts in this case.  For simplicity, this transcript will be referred to as "Tr." throughout the order.  On October 5, 2010 the Secretary filed another, more extensive administrative record, Dkt. Nos. 46-49, referred to throughout the order as "2010 Tr."  The 2010 Tr. contains most of the information found in the first transcript, but includes, most significantly, the ALJ's modified initial decision of Dec. 19, 2005, which was not included in the initial record.  Moreover, the 2010 Tr. contains additional documents and correspondences related to plaintiff's appeals and additional medical and billing records.  Plaintiffs' briefs here cite exclusively to the 2010 Tr., although they agree that this case is limited to review of Judge Rogers's decision of September 21, 2004, as amended on December 19, 2005.  Pl.'s Reply Br. 6, Dkt. No. 57.

United States District Court
For the Northern District of California

1  itself, will not." ).  At the time of decedent's surgery, an existing national noncoverage decision,

2  CIM 65-15, excluded coverage for ventricular assist devices "when used as an artificial heart."  Tr.

3  87.  Under CIM 65-15, Medicare would only cover ventricular assist devices "for approved

4  transplant candidates as a bridge to cardiac transplantation."  *Id.*  Neither party disputes the ALJ's

5  finding that decedent was not a heart transplant candidate.  Tr. 64, 66.

6          On October 30, 2000, the CMS Regional Office in Seattle issued a letter to the PHADE

7  project manager stating, "after careful examination of your PHADE study, it has been determined

8  that it is deemed to automatically qualify to receive Medicare coverage for costs identified in [CIM

9  30-1]."  Tr. 207.  However, on April 30, 2001, the CMS Regional Office sent another letter

10 retracting the October 30 letter regarding coverage of the PHADE trial.  Tr. 202.  The April 30 letter

11 stated that CMS had "since learned that the PHADE study does not meet the criteria for deemed

12 status.  In addition, HCFA [Health Care Financing Administration] does not issue opinion letters on

13 individual trials."  *Id.*  In a subsequent letter to SHMC, CMS wrote:

14          Subsequent to our letter of October 30, 2000, we discovered that our office did not
            have the authority to make a determination as to deemed status for any clinical trials.
15          As indicated in our letter of April 30, 2001, we cannot authorize deemed status for
            your study, and as a result, there is no legal basis for payment for routine costs
16          associated with the study after September 19, 2000.

17 Tr. 200.

18     **B.  Procedural History**

19         **1.  CMS's May 23, 2003 coverage decision**

20          Decedent's family did not become immediately aware that CMS deemed the PHADE study to

21 be ineligible for coverage.  It was not until May 23, 2003, nearly three years later, that CMS notified

22 decedent's estate that it had denied payment for all services after the LVAD implant on August 4,

23 2000.  Tr. 189.  CMS's May 23 notice to plaintiffs indicates that Medicare reimbursed SHMC only

24 for the eleven day period prior to the PHADE study, July 24, 2000 to August 3, 2000, under

25 standard Diagnostic Related Groups ("DRG") codes.[2]  Tr. 181-82, 189-99.  Following this decision,

26 _____

27 [2]  Diagnostic Related Groups is "[a] classification system that groups patients according to
    diagnosis, type of treatment, age, and other relevant criteria.  Under the prospective payment system,
28 hospitals are paid a set fee for treating patients in a single DRG category, regardless of the actual
    cost of care for the individual."  2010 Tr. at 1243; *see, e.g.*, CMS.gov, List of Diagnosis Related

United States District Court
For the Northern District of California

1    decedent's son, Michael DeSantis ("DeSantis"), sought clarification of the coverage status over a

2    period of three years, always seeking coverage for the entire period of his father's hospitalization

3    from July 24, 2000 to December 26, 2000.  On July 11, 2003, DeSantis requested reconsideration of

4    the denial, explicitly referencing the "total costs" associated with the entire time frame of the clinical

5    trial (August 4, 2000 through December 26, 2000).  Tr. 187.  On October 28, 2003, CMS denied

6    DeSantis's request for reconsideration, explaining that, although there had been confusion about

7    whether the decedent's LVAD implant surgery might be reimbursed under the clinical trials national

8    coverage decision CIM 30-1, "the study in which [decedent] was involved did not and does not

9    qualify for this coverage."  Tr. 181-83.

10                      **2.  DeSantis's request for an administrative hearing**

11            On December 15, 2003, DeSantis requested a hearing before an Administrative Law Judge

12   ("ALJ").  Tr. 174-75.  In his request, he stated:

13           The basis for the ALJ Hearing is the attached CMS/HCFA letter issued on October
             30, 2000 confirming CMS/HCFA's automatic deeming of the clinical trial meeting
14           guidelines and hence covering the medical costs beginning on September 19, 2000[,]
             the effective date of President Clinton's Clinical Trials Executive
15           Order/Memorandum issued on June 7, 2000 mandating Medicare to cover Clinical
             Trials.
16
     Tr. 175.  The assigned ALJ, Sandra K. Rogers, sent a letter dated April 22, 2004 to DeSantis
17
     regarding his case.  Tr. 77-79.  After summarizing the record as it then stood, the ALJ stated, "[t]he
18
     principal issue is whether the bulk of the services provided to your father during the period
19
     beginning on September 19, 2000 are covered under the NCD [(national coverage decision CIM 30-
20
     1)] (or any other valid coverage provision in Part A or Part B of the Medicare statute)."  Tr. 78.  The
21
     ALJ stated that because this was essentially a legal issue, she would likely deny DeSantis's request
22
     for subpoenas of various medical records and documents.  *Id.*  The ALJ asked DeSantis for a written
23
     statement identifying any disputed facts, "all relevant Medicare coverage rules and policies
24
     applicable to your father's case," and arguments on how the disputed costs were covered under those
25
     rules and policies.  Tr. 79.
26
            On June 21, 2004, DeSantis responded to the ALJ's request for a written statement.  Tr. 71-
27

28   Groups (DRGs), FY 2009,
     http://www.cms.gov/site-search/search-results.html?q=list%20of%20diagnosis%20related
     %20groups.

73.  He explained that his family had been advised of President Clinton's executive order in July

2000 and assured by the heart surgeon and hospital staff that Medicare would cover the trial's

charges.  *Id.*  DeSantis also stated that they were now generally aware of Medicare's national

coverage decision CIM 30-1 and "[i]n hindsight, the effective date of the 19th is explained[, b]ut

early on, when Medicare first approved the coverage for my father, only the effective date of

September 19th was conveyed to us."  Tr. 71.  DeSantis argued that CMS should be bound by the

October 30, 2000 letter deeming the PHADE study to automatically qualify for Medicare coverage.

Tr. 72-73.  DeSantis argued that a letter from CMS was the only way one could secure a guarantee

of coverage and questioned how the agency could make such an error regarding the coverage

guidelines.  *Id.*

### 3. The ALJ's September 21, 2004 decision

The ALJ determined that a hearing need not be held and, on September 21, 2004 issued a

partially favorable decision.  Tr. 57-67.  In her decision, the ALJ framed the issues as follows:

> The general issue before the [ALJ] is whether the service provided to the beneficiary
> between September 19, 2000 and December 26, 2000 were covered for Medicare
> purposes.  The specific issue to be decided is whether the Medicare coverage exists
> for some or all of the costs associated with the beneficiary's care under the provision
> of [CIM] 30-1, which provided for the coverage of routing costs of qualifying clinical
> trials furnished on or after September 19, 2000.

Tr. 59.  The ALJ specifically noted DeSantis's reliance on CIM 30-1 and CMS's October 30, 2000

coverage letter indicating that PHADE qualified for automatic coverage.  Tr. 62-65.  The ALJ

concluded that CMS was bound by its statement in the October 30, 2000 coverage letter, and thus

required to cover the routine costs of the PHADE trial under CIM 30-1, with respect to decedent, as

of its effective date of September 19, 2000.  Tr. 66.  However, the ALJ found that decedent was not

a candidate for heart transplant, and thus, national noncoverage provision CIM 65-15 operated to

preclude payment of costs for the LVAD implantation itself.  *Id.*  Accordingly, the ALJ ordered

CMS "to determine those items and services provided to the beneficiary between September 19,

2000 and December 26, 2000 which constitute covered costs and to pay them in accordance with the

coverage provisions of CIM 30-1."  *Id.*

### 4. CMS's "corrected" payment and DeSantis's appeal

In response to the ALJ's Order, on May 4, 2005, CMS made a payment to SHMC as "a

1   correction to [the] previously processed claim." Tr. 42.  Medicare paid SHMC for services rendered

2   after September 19, 2000 under standard DRG and outlier services codes.  2010 Tr. 1243 (June 10,

3   2005 fax from Medicare Benefit Integrity Officer to DeSantis explaining the breakdown of the May

4   4, 2005 payment).  On August 29, 2005, DeSantis appealed CMS's "corrected" coverage decision to

5   the fiscal intermediary.  Tr. 40-41.  According to DeSantis, the payment was contrary to the ALJ's

6   order to reimburse services incurred on or after September 19, 2000 under CIM 30-1.  Tr. 40.

7   Moreover, CIM's "corrected" payment did not cover *any* costs prior to September 19, 2000 under

8   CIM 30-1, or on the basis of any other billing code, and DeSantis argued that CMS was still required

9   to reimburse *all* costs under standard DRG and outlier services billing codes:

> 10  When I spoke with Dr. Bernice Hecker, Noridian Financial Intermediary, in late
> 2004/early January 2005, I was advised my father's entire hospital stay from
> 11  07/24/2000 to 12/26/2000 should be covered by Medicare as her review of the bill
> confirmed ***ALL charges were for routine charges related to my father's underlying
> 12  Congestive Heart Failure problem except for the charges associated with the
> intervention itself***, specifically the implant device and implant surgery.
>
> 13
> ***The claim was paid using a Diagnosis-Related Group (DRG) and Outlier Services
> 14  which should have covered the entire hospital stay: consequently, the entire
> hospital stay from 7/24/2000 to 12/26/2000 should be covered*** as my father was
> 15  "Admitted to evaluate for revascularization and or other surgical or medical
> therapies".  My father had a total of 150 days of benefits of which only 98 were used;
> 16  therefore, we are requesting an adjustment be made to cover the entire hospital stay.

17  Tr. 40 (emphases added).  DeSantis also identified other alleged errors in the payment calculation.

18  Tr. 40-41.  On September 8, 2005, DeSantis sent a request to the fiscal intermediary to amend his

19  August 29, 2005 appeal to add a request that "Medicare also cover the charges associated with the

20  intervention itself, specifically the implant device and implant surgery based on the Executive

21  Memorandum President Clinton signed on June 7, 2000 mandating Medicare cover the cost of

22  Clinical Trials."  Tr. 46.

23       The fiscal intermediary directed DeSantis to appeal the issues related to CMS's interpretation

24  of the ALJ's order directly to the ALJ.  Tr. 38.  Thus, on November 23, 2005, DeSantis sent a letter

25  to the ALJ appealing CMS's interpretation of her order, asking her: (1) to order Medicare to pay for

26  decedent's *entire* hospital bill under standard DRG and outlier services billing codes for routine care

27  for decedent's underlying congestive heart failure; and (2) to correct her fact finding with respect to

28  the start date of the PHADE study (because the ALJ's decision incorrectly stated that decedent
    joined

the PHADE study in July 2000, as opposed to August 2000, the fiscal intermediary had relied on this

finding to revoke CMS's previous coverage of the eleven day period from July 24, 2000 through

August 3, 2000 prior to decedent's PHADE trial start date). DeSantis specifically appealed the issue

of whether the ALJ's order prevented CMS from covering services between August 4, 2000 and

September 18, 2000 under standard DRG and outlier services billing codes. *Id.* DeSantis appealed

as follows:

> In January 2005 after Dr. [Bernice] Hecker's review of the bill she indicated the entire bill from July 24, 2000 through December 26, 2000 should be covered by Medicare. She stated the care that was provided was routine care for my father's underlying congestive heart failure with the exception of the intervention itself. ***Medicare paid only the part you ordered them to pay; however, they did not pay based on the Clinical Trial [national coverage decision, CIM 30-1] as you ordered; rather, Medicare paid the ordered days as a standard DRG (Diagnostic Related Group). The only reason they did not cover the entire bill is because they were bound to ONLY implement your Order which was to pay ONLY the period corresponding to the start of the Clinical Trial*** [national coverage decision, CIM 30-1] (i.e. September 19, 2000). ***Based on the how [sic] Medicare paid the part of the claim you ordered them to pay and Dr. Bernice Hecker's original assessment of the bill, we are appealing to you to order Medicare to pay the entire bill***.

Tr. 38-39 (emphases added).

### 5.  The ALJ's December 19, 2005 amended decision

In response, on December 19, 2005, the ALJ amended her previous order to correctly state

that decedent became a participate in the PHADE clinical trial in August 2000 rather than July 2000.

2010 Tr. at 57.  This finding permitted Medicare to reimburse decedent for the charges incurred

from July 24, 2000 through August 3, 2000, prior to the PHADE trial.  The ALJ did not, however,

address DeSantis's request for a review of the denial of coverage between August 4, 2000 and

September 18, 2000 under standard DRG and outlier services billing codes corresponding to routine

care for his father's underlying congestive heart failure–i.e., items and services not directly tied to

the PHADE clinical trial and LVAD implantation.

In addition to amending her decision, the ALJ also treated DeSantis's 23, 2005 letter as a

request for review and forwarded it to the Medicare Appeals Council. Tr. 26.  On March 6, 2007,

Although DeSantis's appeal of the ALJ's order was outside of the normal sixty-day appeal period, the

Appeals Council found that he had good cause for late filing (because of CMS's delayed decision

implementing the ALJ's order, and his appeal immediately thereafter), but nevertheless denied

1   DeSantis's request for review on other grounds, and the ALJ's decision became the final decision of

2   the Secretary.  Tr. 25-27.

3                                    **II.  ANALYSIS**

4       **A.  Judicial Review**

5            Section 1395ff(b)(1)(A) of the Medicare Act provides for judicial review of final decisions

6   of the Secretary regarding benefits paid under Medicare.  42 U.S.C. § 1395ff.  This court's review is

7   governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Under the APA, the

8   Secretary's decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or

9   otherwise not in accordance with law" or "unsupported by substantial evidence in the record."  5

10  U.S.C. §§ 706(2)(A), (E).  "A decision is arbitrary and capricious if[, *inter alia*,] the agency 'has . . .

11  entirely failed to consider an important aspect of the problem . . . .'"  *O'Keeffe's, Inc. v. United States*

12  *Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs.*

13  *Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)).  "Review under the arbitrary and

14  capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the

15  agency."  *Id.* (citation omitted).  Judicial review is generally limited to the administrative record, and

16  "[*d*]*e novo* factfinding by the district court is allowed only in limited circumstances."  *Occidental*

17  *Eng'g v. Immigration & Naturalization Servs.*, 753 F.2d 766, 769 (9th Cir. 1985) (citing *Citizens to*

18  *Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano*

19  *v. Sanders*, 430 U.S. 99 (1977) (explaining that de novo review under the APA is authorized only:

20  (1) "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate";

21  or (2) "where issues that were not before the agency are raised in a proceeding to enforce

22  nonadjudicatory agency action").

23      **B.  Summary Judgment**

24           Plaintiffs move "for summary judgment ordering Medicare to pay services rendered to

25  [d]ecedent for the period of August 4, 2000 through September 18, 2000; or in the alternative,

26  remand the matter back to the ALJ for further consideration in light of how fiscal intermediaries

27  calculated monies paid to date using the Diagnosis Related Group [DRG] and Outlier Services

28  calculations as routine medical care . . . ."  Pls.' Br. 10.  Defendant opposes the motion and makes a

**United States District Court**
For the Northern District of California

1    cross-motion for summary judgment stating that plaintiffs are precluded from raising these issues in

2    judicial review without having first obtained a final decision at the administrative level. Unlike the

3    use of summary judgment in original district court proceedings, summary judgment in the district

4    court's review of an administrative agency's proceedings is a mechanism for deciding the legal

5    question of "whether the agency could reasonably have found the facts as it did." *Occidental*, 753

6    F.2d at 770.

7        **C. Discussion**

8        The September 21, 2004 ALJ Order, including the December 15, 2005 amendment, is the

9    "final decision" of the Secretary on appeal. The final decision required CMS to pay routine costs of

10   decedent's participation in the PHADE clinical trial from September 19, 2000 through December

11   26, 2000, and (as amended) to pay the decedent's hospital bills for services for the period of July 24,

12   2000 through August 3, 2000 (prior to decedent's surgical intervention). The August 4, 2000 to

13   September 18, 2000 time period is excluded in the final decision. The primary issue is whether this

14   time period, August 4, 2000 through December 26, 2000 is sufficiently raised in the administrative

15   record, such that judicial review under the APA is appropriate.

16       DeSantis argues that the fiscal intermediaries who made the coverage determinations on

17   behalf of CMS (Dr. Bernice Hecker and Patricia Barton) "advised them that all of the care provided

18   to [d]ecedent should be covered but that they were *precluded from doing so* because of the

19   determination by Judge Rogers that only the dates of July 26, 2000 through August 3, 2000 and

20   September 19, 2000 through December 26, 2000 would be covered." Pl.'s Br. 7 (emphasis added).

21   Plaintiffs assert that the ALJ's omission of this critical issue in her amended decision was arbitrary

22   and capricious as a failure to consider an important aspect of the problem, and therefore ask the

23   court to enter judgement requiring the Department to pay for routine medical services provided to

24   decedent during this time frame. *Id.* 8-9.

25       The Secretary argues that "plaintiff limited his challenge to Medicare's denial of payment of

26   routine costs to those dates of service on or after the September 19, 2000 effective date of the

27   Clinical Trial [national coverage decision], and that he failed to timely raise any arguments about

28   claim denials for the period August 4, 2000 to September 18, 2000." Def.'s Response Br. 9-10. The

ORDER DENYING BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND REMANDING—No. C-07-03564 RMW
ALG

United States District Court
For the Northern District of California

1  Secretary relies on the ALJ's decision itself, which identifies the "general issue" as "whether the

2  service provided to the beneficiary between September 19, 2000 and December 26, 2000 were

3  covered for Medicare purposes," and the "specific issue" as "whether the Medicare coverage exists

4  for some or all of the costs associated with the beneficiary's care under the provisions of [CIM] 30-1

5  . . . ." Tr. 59.  The Secretary asserts that "plaintiffs are precluded form raising this issue for the first

6  time in an action for judicial review since a claimant must first obtain a final decision on new claims

7  at the administrative level before a district court can review them."  Def.'s Response Br.10.

8           Contrary to the Secretary's argument, however, DeSantis is not raising this issue for the first

9  time in the present request for judicial review.  Since CMS issued its May 23, 2003 coverage

10  decision to the present date, DeSantis' position has clearly been that decedent is entitled to

11  reimbursement for all medical services rendered from July 24, 2000 through December 26, 2000.

12  Tr. 187. (DeSantis's first request for reconsideration of the May 23, 2003 coverage decision).

13  Although DeSantis originally alleged CIM 30-1 as a basis for coverage, Tr. 174-75 (DeSantis's

14  request for an ALJ hearing), he never abandoned his original and primary argument before the CMS

15  that all dates of his father's hospitalization were eligible for coverage.  Indeed, immediately

16  following the fiscal intermediary's May 4, 2005 "corrected" payment, DeSantis asked CMS for a

17  breakdown of the payment.  2010 Tr. 1243.  Shortly after learning that Medicare paid for the

18  "clinical trial" services rendered after September 19 under standard DRG and outlier services codes,

19  DeSantis immediately appealed to both the fiscal intermediary and the ALJ to consider whether the

20  services rendered prior to September 19 also qualified for reimbursement on that basis.  Tr. 38-41.

21  He stated to the fiscal intermediary: "ALL charges were for routine charges related to my father's

22  underlying Congestive Heart Failure problem except for the charges associated with the intervention

23  itself, specifically the implant device and implant surgery."  Tr. 40.  Again, in his appeal to the ALJ,

24  DeSantis specifically took issue with CMS's interpretation of the ALJ's order as preventing payment

25  from August 4, 2000 through September 18, 2000 under standard DRG and outlier services billing

26  codes.  Tr. 38-39.  He reiterated that "the entire bill from July 24, 2000 through December 26, 2000

27  should be covered by Medicare . . . [as] routine care for my father's underlying congestive heart

28  failure."  *Id.*  He further argued: "Medicare paid only the part you ordered them to pay; however,

they did not pay based on

the Clinical Trial [national coverage decision, CIM 30-1] as you ordered; rather, Medicare paid the ordered days as a standard DRG . . . . The only reason they did not cover the entire bill is because they were bound to ONLY implement your Order which was to pay ONLY the period corresponding to the start of the Clinical Trial." *Id.* Finally, plaintiffs stated to the ALJ: "we are appealing to you to order Medicare to pay the entire bill." *Id.* Accordingly, the question of coverage for the period from August 4, 2000 through September 18, 2000, is squarely presented in the administrative record.

The problem is that the ALJ fails to directly address the issue in her amended decision, which she issued in response to plaintiff's arguments stated above. Thus, the fiscal intermediary interpreted the order as prohibiting *any* payments from August 4, 2000 through September 18, 2000. The court does not believe this to be the intent of the ALJ's order.

The ALJ's order conclusively determined that decedent's participation in the PHADE study is eligible for coverage under CIM 30-1, effective September 19, 2000, but it does not so find at the exclusion of what would be otherwise standard coverage. As discussed, CMS calculated covered costs from July 24, 2000 to August 4, 2000 and from September 19, 2000 to December 26, 2000 using standard DRGs to determine billing. It would be nonsensical if, based on the ALJ's order, decedent is somehow no longer eligible for otherwise covered services during the period in the interim. Plaintiffs point to a variety of services during the disputed time frame that may, in fact, be eligible for coverage outside of CIM 30-1, including: "additional surgery on [d]ecedent's right dorsal wrist on August 9, 2000[;] Bronchoscopy on August 10, 2000; hand surgery on August 14, 2000[;] and thoracostomy and evacuation of the left hemothorax on August 30, 2000." Pl.'s Reply Br. 4. According to plaintiffs, "[t]hese are all procedures which should have been covered as medically necessary care whether as a result of [d]ecedent's health or due to a complication that arose following the insertion of the mechanical heart." *Id.* Because the issue of whether services rendered between August 4, 2000 and September 18, 2000 may be eligible for coverage outside of CIM 30-1 is a factual issue, and because the ALJ never addressed this issue in the first instance, the court cannot answer the question of "whether the agency could reasonably have found the facts as it did," as required for summary judgment. *Occidental*, 753 F.2d at 770. Instead, the court remands to the

1   ALJ to consider whether any of the services incurred by decedent between August 4, 2000 and

2   September

3

4   18, 2000 are otherwise eligible for coverage outside of CIM 30-1.

5       This court does not disrupt the ALJ's finding that medical care obtained prior to September

6   19, 2000 is not eligible for coverage based on CIM 30-1.  Similarly, this court does not disrupt the

7   ALJ's finding that the surgical intervention of August 4, 2000 (the insertion of the LVAD) is not

8   covered based on CIM 65-15.  Both of these findings are in accordance with the law and supported

9   by substantial evidence in the record.  *See* 5 U.S.C. § 706(2)(A), (E).

10              **III.  ORDER**

11      For the foregoing reasons, the court denies both parties' motions for summary judgment and

12  remands the case to the ALJ to address the issue of whether services rendered to decedent from

13  August 4, 2000 through December 26, 2000 may be eligible for coverage on any basis outside of

14  CIM 30-1.

15

16

17  DATED:    _____January 23, 2013_____                    *Ronald M. Whyte*

18                                                          RONALD M. WHYTE
                                                            United States District Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California